IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

[1]  JUAN CARLOS ORTIZ-VAZQUEZ,
       aka "FLACO,"
       (Counts 1-8)
[2]  CRISTINA GUEVARA-CASELLAS,
       (Counts 1-8)
[3]  ELIAS MARTINEZ-RIVERA,
       aka "VIEJO-COLI,"
       (Count 1)
[4]  JOSE LUIS AUDAIN-
       RODRIGUEZ,
       aka "WICHY, NEGRE, DOBLE V-
       W, DOBLETA,"
       (Count 1)
[5]  CHRISTOPHER SANCHEZ-
       ASENCIO,
       aka "GUAYNA,"
       (Count 1)
[6]  MOISES MOJICA-TORRES,
       aka "MOI,"
       (Counts 1 and 2)
[7]  ERNESTO MALAVE-SANTIAGO,
       aka "PONCE,"
       (Counts 1, 2, and 9)
[8]  STEVE VERGELI-NEGRON,
       aka "BOCILLO,"
       (Count 1)
[9]  JIM ALMODOVAR-
       QUIRINDONGO,
       aka "JIM BALL,"
       (Count 1)

CRIMINAL NO. 24-456(SCC)

[10] ANGEL ABDIEL ARCHILLA-
MONTALVO,
(Count 1)

[11] EFRAIN GONZALEZ-SERRANO,
aka "EL SENOR DE LOS CIELOS,
JUNITO,"
(Count 1)

[12] ERNESTO VARGAS-RODRIGUEZ,
aka "GOLO,"
(Count 1)

[13] EDDIBER PEREZ-BURGOS,
aka "COAMO,"
(Count 1)

[14] ABRAHAM RODRIGUEZ-CRUZ,
aka "BEBE,"
(Count 1)

[15] ALEXANDER ALVARADO-
ALMESTICA,
aka "BALA,"
(Count 1)

[16] JENSEN MEDINA CARDONA,
(Count 1)

[17] EDGARDO SANTIAGO-COLON,
aka "CUCO,"
(Count 1)

[18] EDWIN SANCHEZ-RIJOS,
aka "TOCAYO,"
(Count 1)

[19] FELIX SERRANO-ROMAN,
aka "COBA,"
(Count 1)

[20] HARRY ACEVEDO-MENDEZ,
aka "LA H,"
(Count 1)

[21] HERIBERTO ROMERO-
CORCHADO,
aka "ERI,"
(Count 1)

[22] JAMES SANTANA-GONZALEZ,
   aka "PILIN,"
   (Count 1)
[23] JULIO VARGAS-JIMENEZ,
   aka "JULIO GATILLO,"
   (Count 1)
[24] KERVIN LOPEZ-TORRES,
   aka "BEETHOVEN, GORDO,
   GEMELO,"
   (Count 1)
[25] KEVIN HERNANDEZ-RUIZ,
   aka "PESADILLA,"
   (Count 1)
[26] MIGUEL GONZALEZ-
   CONCEPCION,
   aka "OMY BARBER, OMY
   GALLINA,"
   (Count 1)
[27] LUIS MELENDEZ-GARCIA,
   aka "LUISITO HUMACAO,"
   (Count 1)
[28] ANIBAL RAMIREZ-ALICEA,
   aka "NIBBY, ANIBAL MARTINEZ-
   ALICEA,"
   (Count 1)
[29] BENNY RODRIGUEZ-MERCADO,
   (Count 1)
[30] CHRISTIAN CANDELARIA-
   FELICIANO,
   aka "GARBANZO,"
   (Count 1)
[31] DONATO CORTES-MATOS,
   (Count 1)
[32] WESLEY CORREA-LOPEZ,
   (Count 1)
[33] MILAGROS JEANETTE RIVERA-
   GONZALEZ,
   aka "JANET,"
   (Count 1)

[34] MINERVA ROMAN-
DOMINGUEZ,
(Count 1)

Defendants.

## MEMORANDUM IN SUPPORT OF DETENTION

## INTRODUCTION

The United States respectfully submits this memorandum in support of its application for a pretrial order of detention for the specific defendants listed below, who are members of State Prison Gang 31 ("the Gang") or co-defendants charged with assisting the Gang from the outside community. The Gang is responsible for the trafficking of controlled substances into various state correctional facilities, including Fentanyl, Heroin, Cocaine and other unauthorized controlled substances and prohibited items.

The United States is seeking pretrial orders of detention for the following defendants: [1] Juan Carlos Ortiz-Vazquez aka "Flaco," [2] Cristina Guevara-Casellas, [3] Elias Martinez Rivera aka "Viejo Coli," [4] Jose Luis Audain-Rodriguez, aka "Wichy, Negre, Doble V-W, Dobleta," [5] Christopher Sanchez-Asencio, aka "Guayna," [6] Moises Mojica-Torres aka "Moi," [7] Ernesto Malave-Santiago, aka "Ponce," [9] Jim Almodovar-Quirindongo, aka "Jim Ball," [11] Efrain Gonzalez-Serrano, aka "El Senor de Los Cielos," [12] Ernesto-Vargas-Rodriguez, aka "Golo," [13] Eddiber Perez-Burgos, aka "Coamo," [14] Abraham Rodriguez-Cruz, aka

"Bebe," [15] Alexander Alvarado-Almestica, aka "Bala," [16] Jensen Medina-Cardona, [17] Edgardo Santiago-Colon, aka "Cuco," [18] Edwin Sanchez-Rijos, aka "Tocayo," [19] Felix Serrano-Roman, aka "Coba," [20] Harry Acevedo-Mendez, aka "La H," [21] Heriberto Romero-Corchado, aka "Eri," [22] James Santana-Gonzalez, aka "Pilin," [23] Julio Vargas-Jimenez, aka "Julio Gatillo," [24] Kervin Lopez-Torres, aka "Beethoven, Gordo, Gemelo," [25] Kevin Hernandez-Cruz aka "Pesadilla," [26] Miguel Gonzalez-Concepcion, aka "Omy Barber, Omy Gallina," [27] Luis Melendez-Garcia aka "Luisito Humacao," [28] Anibal Ramirez-Alicea aka "Nibby, Anibal Martinez-Alicea," [29] Benny Rodriguez-Mercado, [30] Christian Candelaria-Feliciano, aka "Garbanzo," [31] Donato Cortes-Matos, [32] Wesley Correa-Lopez and [33] Milagro Jeanette Rivera-Lopez aka "Janet."

From the defendants listed above, 23 defendants are currently serving state sentences for which the Court issued Writs of Habeas Corpus ("writ") for purposes of prosecution in federal court. On December 17, 2024, law enforcement officers will be executing arrest warrants for the remaining eleven defendants. For the reasons set forth below, at their Initial Appearance and Arraignment, the Court should enter pretrial orders of detention, as no conditions or combination of conditions can assure the safety of the public or the defendant's appearances at trial. Thus, pursuant to 18 U.S.C. § 3142(e), the defendants' detention pending trial is justified.

<u>DISCUSSION</u>

I.    <u>THE CHARGES</u>

On December 12, 2024, a federal grand jury sitting in the District of Puerto Rico returned an Indictment charging the above listed defendants with: (1) Controlled Substance Conspiracy in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B)(all 34 defendants); (2-5) Aiding and Abetting in the Distribution of Controlled Substances Resulting in Death in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(C) (four defendants); (6-8) Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity-Aiding and Abetting-, in violation of 18 U.S.C. § 1957 (2 defendants) and; (9) Possession of a Firearm in Furtherance of a Drug Trafficking Crime) 18 U.S.C. § 924(c) (one defendant).

If convicted of Count One alone, the defendants face a mandatory minimum sentence of ten-years of imprisonment with a maximum sentence of life imprisonment. Defendants charged in Counts Two through Five, if convicted, face a mandatory minimum sentence of twenty-years of imprisonment with a maximum sentence of life imprisonment. For defendants with prior felonies involving serious drug offenses or violent crimes, a conviction under Count One may increase the exposure to a minimum sentence of fifteen years up to life. Similarly, defendants charged in Counts Two through Five who also have prior felony convictions involving serious drug offenses or crimes of violence may be exposed to a mandatory life sentence.

## II.    THE GANG'S ORGANIZATION, STRUCTURE AND OPERATIONS

The Group 31 Prison Gang (hereinafter "Group 31"), whose members are known as Los Tiburones ("the Sharks") was formally created in 1988. Group 31's founding members registered the non-profit corporation with the Puerto Rico Department of State under the name "G31-Octubre-1988 Tiburones Inc." Group 31's symbol is a shark fin.

The incorporation documents indicate that Group 31 objectives were: a) to establish and promote communication with the Puerto Rico Department of Corrections and Rehabilitation, the Legislative Assembly, and the Executive Branch; b) to seek better equal opportunities for each inmate to improve the quality of life within the Correctional System of Puerto Rico; and c) promote moral and social rehabilitation in accordance with the ideals enshrined in the Constitution of the Commonwealth of Puerto Rico and its laws. Notwithstanding these stated objectives, current practice and activities of Group 31 within the Puerto Rico prison system involves significant criminal activity, including violence, drug trafficking, and money laundering.

Group 31 established a series of "norms" or "rules" that members were expected to follow. However, the establishment of certain rules and norms did not preclude Group 31, during the timeframe relevant to this Indictment, from: a) controlling the distribution of illegal substances in several institutions, resulting in serious bodily injury and multiple overdose deaths; b) establishing a Group 31

disciplinary system that included severe beatings of inmates; c) establishing government liaisons for the purpose of reducing prison sentences; d) mandating political affiliations and directing prisoners who to vote for in primary and general elections; e) obtaining preferential treatment from the prison staff within the institutions; and f) smuggling cellular phones and other prohibited items into the institutions where they were being housed.

Group 31 established and maintained control of significant illegal substances distribution at numerous institutions operated by the Puerto Rico Department of Corrections and Rehabilitation. Those institutions included, but were not limited to: a) Institucion Correccional Guerrero, Aguadilla; b) Complejo Correccional Las Cucharas Sgto. Pedro Joel Rodriguez Matos, Ponce; c) Institución Correccional Bayamon (501); and d) Institución Correccional Guayama Maxima Seguridad (1000).

Group 31 established and followed a leadership structure within the correctional institutions. The principal leader of Group 31 was called the Maximum Leader. Serving beneath the Maximum Leader were Module Leaders who managed Group 31's day-to-day activities within the prison module where they resided. Within each module were Security Leaders, who, along with other Group 31 members, were in charge of "security" and discipline within the modules. Also serving within the modular leadership structure were Orderlies, who were in charge of the illegal substance distribution within the modules where they resided.

To distribute illegal substances within the institutions, members of Group 31 relied on close associates in the free community to complete tasks essential to the enterprise. These associates, several of whom are charged herein, worked with and for Group 31 with full knowledge of the illegal purpose of their actions. The roles played by these associates on the outside included, but were not limited to: a) purchasing the illegal substances distributed in the institutions; b) packaging the illegal substances distributed in the institutions; c) arranging for the smuggling of the illegal substances into the institutions through various methods; d) collecting payments for the illegal substances; and e) conducting financial transactions to further the financial interests of the enterprise.

Group 31 trafficked multiple illegal substances within the institutions they controlled. Those included, but were not limited to: a) fentanyl; b) suboxone; c) heroin; d) cocaine; e) marijuana; and f) synthetic marijuana. Group 31 received its supply of narcotics from several sources, including members of other prison gangs (i.e. Los 25) who were housed in some of the same institutions as Group 31 members.

Group 31 successfully smuggled the illegal substances into these institutions utilizing several methods. One of the principal smuggling methods involved using unmanned aerial vehicles (hereinafter "drones") that carried packages containing the illegal substances. The drones would be remotely navigated by pilots, who frequently carried firearms to protect themselves and the illegal substances. Pilots would drop

the packages containing illegal substances within the prison grounds where they would be collected by members of Group 31, or individuals working on behalf of Group 31, for subsequent distribution within the institutions. In addition, Group 31 smuggled illegal substances into the institutions using, among others: a) legal mail; b) family visits; c) official corruption/indifference; d) catapulting or throwing drugs into the prison yards ("picheos"); and e) hiding drugs inside other items entered into the prisons (i.e. PlayStations, remote controls, food items, and bags of ice).

Group 31 financed their enterprise through the sale and distribution of illegal substances within the institutions. Financial control and accounting for the enterprise was conducted by members of the organization in the free community. Payment for drug transactions generally did not occur within the institutions. Instead, members of the organization in the free community opened and maintained accounts in several banks and credit unions throughout Puerto Rico. Those members would send and receive payments for the illegal substances in cash, as well as through Automated Clearinghouse Credits (electronic payments that move money from one account to another).

Group 31 members benefited from a pattern of official corruption and/or indifference by employees in charge of the inmates. In limited circumstances, staff members participated in the introduction and distribution of illegal substances on behalf of Group 31. At other times, through indifference or improper acts, staff

members allowed Group 31's illegal drug distribution operation to thrive, through, among other things: a) telling Group 31 members when law enforcement was present in an institution; b) providing favorable intelligence to Group 31; c) allowing Group 31 to operate its own disciplinary system; d) failing to document and report incidents as required by policy; and e) failing to register seized items into evidence as required by policy.

Group 31 members received privileges not afforded to other similarly situated prisoners housed in the same institutions. Those privileges included but were not limited to: a) special visiting hours; b) visits not authorized by prison regulations; c) the use of cellular telephones within the institutions; d) the use of PlayStation gaming consoles; e) the use of large screen televisions; and f) the use of Bluetooth earbuds.

Group 31 established its own disciplinary system within its ranks. Discipline of members, as well as some non-members, was handled by Group 31's hierarchy, or members appointed by the leadership. Disciplinary measures utilized by Group 31 included but were not limited to: a) beatings; b) forcing prisoners to sit with their arms crossed so that they could be beaten and kicked; c) withholding food; d) withholding drugs; and e) locking prisoners up and restraining their movement.

The use of illegal substances in penal institutions, including the illegal substances introduced by Group 31, was widespread and dangerous. Inherent issues with the use of illegal substances in prisons include the lack of any regulation as to the

content of the illegal substances, in combination with a fear within the prison population to call for medical assistance if an issue occurs.   In the time period relevant to this Indictment, the illegal substances introduced by Group 31 caused many overdoses and, at least, four overdose deaths attributed to a drug mixture containing fentanyl.

Group 31, as allowed by the Constitution of Puerto Rico, actively participated in elections.  Members of Group 31 were instructed by the group's leadership what candidates to vote for during elections.  Individuals that did not vote for the Group 31 backed candidates were subjected to retribution, including the withholding of illegal substances.

Group 31 communicated by means of contraband telephones and in writing. Group 31 maintained records to monitor the progress of the criminal enterprise, which included, but were not limited to: a) minutes of Group 31 meetings; b) drug ledgers; c) phone contact lists; and d) tally sheets.

## III.    FACTUAL  BASIS IN SUPPORT OF DETENTION

Pursuant to First Circuit precedent, the government proceeds by factual proffer in support of its motion for a pretrial order of detention. *United States v. Acevedo-Ramos*, 755 2d 203, 207-209 (1st Cir. 1985).  Our proffer will articulate facts sufficient to justify detention, however, it is not a complete statement of all of the evidence of which the government is aware or will seek to introduce at trial.  A non-exclusive list of some of

the defendant's overacts and activities of the conspiracy are included below for the defendants not currently in state custody for which the United States is seeking detention.

For the defendants listed below in state custody for which the federal writ was issued, the Court should order the defendants detained because they are appearing on a Writ of Habeas Corpus Ad Prosequendum, and accordingly, are not considered an "arrested person" for purposes of the Bail Reform Act. As such, the Bail Reform Act does not apply to them. *See United States v. Rodriguez-Palacios*, 2019 WL 4954642 (D. Colorado 2019) (Defendant's detention by the State of Colorado remains the basis for his detention here throughout proceedings in this Court); the Writ of Habeas Corpus ad Prosequendum in this case mandates that Defendant remain in temporal federal custody until the conclusion of the criminal proceedings against him).

The defendants currently under a federal writ are as follows: [1] Juan Carlos Ortiz-Vazquez aka "Flaco," [3] Elias Martinez Rivera aka "Viejo Coli," [4] Jose Luis Audain-Rodriguez, aka "Wichy, Negre, Doble V-W, Dobleta," [5] Christopher Sanchez-Asencio, aka "Guayna," [12] Ernesto-Vargas-Rodriguez, aka "Golo," [13] Eddiber Perez-Burgos, aka "Coamo," [14] Abraham Rodriguez-Cruz, aka "Bebe," [15] Alexander Alvarado-Almestica, aka "Bala," [16] Jensen Medina-Cardona, [17] Edgardo Santiago-Colon, aka "Cuco," [18] Edwin Sanchez-Rijos, aka "Tocayo," [19] Felix Serrano-Roman, aka "Coba," [20] Harry Acevedo-Mendez, aka "La H," [21]

Heriberto Romero-Corchado, aka "Eri," [22] James Santana-Gonzalez, aka "Pilin," [23] Julio Vargas-Jimenez, aka "Julio Gatillo," [25] Kevin Hernandez-Cruz aka "Pesadilla," [26] Miguel Gonzalez-Concepcion, aka "Omy Barber, Omy Gallina," [27] Luis Melendez-Garcia aka "Luisito Humacao," [29] Benny Rodriguez-Mercado, [30] Christian Candelaria-Feliciano, aka "Garbanzo," [31] Donato Cortes-Matos, [32] and defendant [32] Wesley Correa-Lopez.

<u>Defendant [2] Cristina Guevara-Casellas</u>

Defendant [2] Cristina Guevara-Casellas is charged in counts 1-8, including Aiding and Abetting in the Distribution of Controlled Substances Resulting in Death and money laundering.  Defendant is the consensual partner of [1] Juan Carlos Ortiz-Vazquez aka "Flaco."  The investigation of the case revealed that defendant is one of the primary logistical and financial coordinators for the Gang.  Information gathered during the investigation revealed that defendant receives order from defendant [1] Juan Ortiz-Vazquez aka "Flaco" via telephonic communications to coordinate controlled substances acquisition outside of the prison, and that the defendant subsequently transfer controlled substances, after meeting with them, to various unmanned aircraft drone pilots around Puerto Rico for delivery to PRDCR institutions.

Additionally, and through special visits and the use of special items authorized by PRDCR Officials, defendant and other co-defendants on multiple occasions brought special items such as food items, microwaves, fans, icebags, remote controls

and others containing contraband into the prison. During the span of the investigation, defendant aided and abetted defendant [1] Juan Carlos Ortiz-Vazquez in the smuggling of fentanyl and other substances into the institution that at least on four occasions led to the death of members of the Gang, who obtained the fentanly or a mixture containing fentanyl inside the prison from other Gang members. For purposes of smuggling contraband into the prison, defendant would arrive at the prison wearing her uniform as a private security guard, carrying a firearm concealed in her waistband, as if she was a regular law enforcement officer in order to obtain special privileges that allow her to introduce the contraband. Defendant obtained authorization from PRDCR Officials to conduct special visits and to bring special "donated" items to the prison to smuggle narcotics.

As part of the investigation, Agents obtained a search warrant for defendant's residence in which firearms were found and seized. The seizures include at least one rifle that belonged to defendant [1] Juan Carlos Ortiz-Vazquez and for which her consensual partner ordered her, in the Summer of 2024, to remove from a property in Corozal, because he suspected that law enforcement officers were following her. Defendant has a valid firearms permit. The investigation revealed that as part of the drug trafficking activities, she was the person that handles most of the payments made and received by the Gang. The way she conducted these financial transactions was through the use of cash payment applications and the opening and closing of multiple

financial institution accounts during the span of the conspiracy. Investigators have been able to determine that her use of two bank accounts in the span of just a couple of years led to the deposits of over one million dollars. Investigators are still analyzing several other financial institutions' accounts and cash payment application accounts to determine the extent of the financial component of the drug trafficking activities. Investigators were able to corroborate the extent of the drug trafficking activities of the Gang by obtaining judicially authorized wiretaps of defendant's telephone number and telephone numbers associated with defendant [1] Juan Carlos Ortiz-Vazquez and other co-defendants for a period of multiple months.

<u>Defendant [6] Moises Mojica-Torres aka "Moi"</u>

Defendant is charged in counts One and Two of the Indictment, including Aiding and Abetting in the Distribution of Controlled Substances Resulting in Death. Defendant is one of the Gang Leaders and the right-hand man of defendant [1] Juan Carlos Ortiz-Vazquez aka "Flaco." Defendant has multiple controlled substances and violent crimes convictions at the state level. Defendant was recently released from prison after serving a lengthy state sentence. After his release, defendant was approached by law enforcement officers for a purposes of a voluntary interview.

After the encounter with law enforcement officers, Agents determined that defendant had alerted defendant [1] Juan Carlos Ortiz-Vazquez aka "Flaco" of the potential filing of charges by federal authorities due to the Gang's drug trafficking

activities. This in turn led defendants [1] Juan Carlos Ortiz-Vazquez aka "Flaco" and [2] Cristina Guevara-Casellas to close out financial accounts and selling properties. Defendant [1] Juan Carlos Ortiz-Vazquez agreed to allow defendant to continue to obtain drug proceeds from drug operations inside the prison, after defendant left the prison. During the course of the judicially authorized interception of communications, Agents were able to corroborate that defendant participated, orchestrated and organized with other Gang Leaders multiple drug ventures to bring contraband into the prison, including a drug venture that led to the death of a gang member as a result of a fentanyl overdose. The planning for the introduction of contraband into the prison included the use of drones and other special items using outside visitors into the institution.

Defendant [7] Ernesto Malave-Santiago Aka "Ponce"

Defendant is charged in counts One, Two and Nine, including Aiding and Abetting in the Distribution of Controlled Substances Resulting in Death and Possession of a Firearm in Furtherance of a Drug Trafficking Crime. Defendant is one of the main drone pilots for the Gang. Agents obtained photographic evidence of defendant traveling to a secluded area in Ponce, Puerto Rico, carrying a firearm, while preparing a drone to be flown to a state prison in Ponce, Puerto Rico. Defendant's involvement with the Gang was corroborated extensively through the judicially authorized intercept of communications in the case. While the monitoring is ongoing,

defendant admits that he had to leave Puerto Rico because two Gang members died of drug overdoses and he needed to stop working with the drones. While he was gone, defendant traveled to New York, wherein he began to work with other individuals in drug trafficking, including defendant [8] Steve Vergeli-Negron aka "Bocillo's" brother. Defendant admits that he was making lots of money, that he was acquiring very powerful controlled substances not seen before, and that he was traveling to places such as Mexico and the Dominican Republic as part of his drug trafficking activities.

During the pendency of the wire interceptions, Agents uncovered that defendant was extremely wary about police officers. At some point, he began to use different cars and began to stay at other residences because he felt that he was being followed by police officers. As part of the investigation, defendant's telephone number was intercepted, but he became suspicious of law enforcement activity and stopped using his telephone. Agents also obtained information that defendant discussed with other co-defendants that mail parcels that have not been received may have been intercepted by law enforcement and how to avoid the potential intervention of law enforcement with these parcels. Agents were also able to obtain several recorded conversations involving defendant concerning multiple drug ventures on behalf of the Gang.

Defendant [9] Jim Almodovar Quirindongo aka "Jim Ball"

Defendant is charged in count One of the Indictment. Defendant served as Drug Pitcher and Drone Pilot for the Gang. During the conspiracy span, several seizures of narcotics have taken place that may be attributed to the drug trafficking activities of defendant. Some of these drugs include Heroin, Cocaine, Fentanyl, Suboxone and other controlled substances not allowed without prescriptions in prisons. Analysis of telephone extractions and Toll records of involving defendant shows extensive communications between defendant and defendant [1] Juan Carlos Ortiz-Vazquez aka "Flaco," [2] Cristina Guevara-Casellas and [7] Ernesto Malave-Santiago aka "Ponce." Defendant has a history of drug related arrests/convictions and as recently as 2023, an arrest involving an incident in which a firearm was discharged against another individual.

Defendant [11] Efrain Gonzalez-Serrano aka "El Senor de Los Cielos"

Defendant is charged in count One of the Indictment. Defendant serves as Drone Pilot for the Gang. During the conspiracy span, several seizures of narcotics have taken place that may be attributed to the drug trafficking activities of defendant. Per information obtained and corroborated during the investigation based on interviews with Sources of Information and cooperators, defendant is responsible for the introduction of contraband with the use of drones into various state facilities in which the Gang operated. In April of 2024, defendant was arrested by state authorities

as he prepared to launch a drone with narcotics and cellular telephones nearby Ponce, Puerto Rico.  Defendant has multiple arrest/conviction records related to narcotics distribution, assault, weapons and domestic violence.

Defendant [24] Kervin Lopez-Torres aka "Beethoven," "Gordo," "Gemelo"

Defendant is charged in count One of the Indictment.  Defendant served as lookout and rescuer for the Gang while serving his prison sentence at Ponce Maxima, Las Cucharas Correctional Complex in Ponce, Puerto Rico.  As a lookout and rescuer, defendant was responsible to obtain drugs delivered into the institution via drones and "picheos."  During the interception of wire communications, defendant is recorded in live conversations actively participating in the introduction of contraband into the prison where he was housed. Defendant has a history of drug related arrests/convictions and domestic violence incidents.  While incarcerated, he also incurred administrative sanctions for possession of contraband, including cell phones and narcotics.

Defendant [28] Anibal Ramirez-Alicea aka "Nibby"

Defendant is charged in count One of the Indictment.  Defendant served as driver of the Drone Pilot.  Defendant is a vetted gang member of the Gang, as he served prison and became part of the Gang while incarcerated.  Defendant served a previous state sentence related to narcotic distribution offenses and was released from state custody in May of 2024.  In October of 2024, defendant and defendant [10] Angel

Abdiel Archilla-Montalvo were stop by local police in Ponce, Puerto Rico, after DEA footage showed them coming from a known trail used by ther Gang to send drones into Las Cucharas Correctional Complex. During the stop, law enforcement officers seized multiple grams of cocaine and fentanyl from defendant's person.

<u>Defendant [33] Milagros Jeanette Rivera-Gonzalez aka "Janet"</u>

Defendant is charged in count One of the Indictment. Defendant served as weapons custodian and drug packing preparer/transporter. As a drug packing preparer and transporter, defendant was responsible for making sure narcotics were prepared, transported and distributed into the state prison facility. Defendant is the sister of defendant [6] Moises Mojica-Torres aka "Moi." Defendant is discussed and appeared on multiple calls on recorded conversations concerning drug trafficking and possession of firearms. On the early part of June of 2024, defendant is video recorded picking up contraband from a parked vehicle belonging to defendant [2] Cristina Guevara-Casellas.

Later that month, on June 27, 2024, defendant delivered a rifle to a state undercover agent, after getting authorization from the Gang (through defendants [1] Juan Carlos Ortiz-Vazquez aka "Flaco" and defendant [6] Moises Mojica-Torres aka "Moi"). She spent several days incarcerated. After she was released on bond, defendant is heard on recorded conversations requesting to the Gang to be allowed to resume her drug trafficking activities on behalf of the Gang because she needed to

make money to pay for her legal fees in the state firearms charge pending. Defendant's arrest in this case has been notified to the state authorities prosecuting her case at the state level.

IV.    LEGAL STANDARD

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., in cases where a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," a court must presume, "subject to rebuttal by the person," that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," if the court finds probable cause to believe that the person committed such offense. 18 U.S.C. § 3142(e)(3)(A). Regardless of whether the presumption applies, such probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination. *United States v. Contreras*, 776 F.2d 51, 54-55 (2nd Cir. 1985).

The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3124(e)(3). A defendant may rebut this presumption by coming "forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the

defendant presents a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight.

In other words, if a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by introducing some evidence to the contrary.  *See United States v. O'Brien*, 895 F.2d 810, 814-815 (1st Cir. 1990).  The government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk.  *United States v. Jackson*, 823 F.2d 4, 5 (2nd Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2nd Cir. 1985).

Detention based on danger to the community must "be supported by clear and convincing evidence." *See* 18 U.S.C. § 3142(f).  The Bail Reform Act lists four factors to be considered in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt.  *See* 18 U.S.C § 3142(g). At a detention hearing, the government may proceed by proffer.  *United States v. Acevedo-Ramos*, 755 2d 203, 207-209 (1st Cir. 1985).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of danger." *See United States v. Caraballo*,

47 F. Supp.2d 190, 191-193 (D.P.R. March 29, 1999) (quoting *United States v. Leon*, 766 F.2d 77, 81 [2nd Cir. 1985]). In considering risk of flight, courts have found that where the evidence of guilt is strong, it provides "a considerable incentive to flee," *United States v. Millan*, 4 F.3d 1038, 1046 (2d Cir. 1993), as does the possibility of a severe sentence, *see United States v. Jackson*, 823 F.2d 4, 7 (2d Cir. 1987); *United States v. Martir*, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses with significant maximum terms had potent incentives to flee); *see also United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico).

The First Circuit has recognized that drug trafficking also poses specials concerns regarding risk of flight. *United States v. Palmer-Contreras*, 835 F 2d 15, 17 (1st Cir. 1987)("drug traffickers pose special flight risks"). The First Circuit in recognizing the presumption's application in drug cases with large amounts of kilograms found:

> Pointing to their strong family ties to Puerto Rico, their meager financial resources, the absence of any prior drug related arrests or convictions, and their minor roles as mules, defendants contend that the district court misapplied § 3142(e)'s presumption and concluded that mere possession of drugs is sufficient ground for detention. We disagree with defendants' interpretation of the district court's detention order. This is no ordinary drug case. Rather, defendants were caught with 195 kilos of cocaine valued at $37,000 to $40,000 per kilo, that is to say, over $7 million worth of cocaine. The large amount of drugs supports the court's inference (for detention purposes) that defendants are connected to persons or an organization with great financial resources, an organization which could finance defendants' relocation. The forfeiture of $100,000 worth of

property would have little financial impact on such an organization. In other words, defendants or the persons with whom they are associated would appear to be involved in the " 'highly lucrative' drug operations at the center of congressional concern" and thus be persons at whom the § 3142(e) presumption is aimed. *Jessup*, 757 F.2d at 386. If, indeed, as the district court concluded, the evidence against defendants is strong, the incentive for relocation is increased.

*Id* at 18.

## V.    THE DEFENDANTS SHOULD BE DETAINED PENDING TRIAL

THE DEFENDANTS PREVIOUSLY DISCUSSED

### A. A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3). Specifically, because the defendants are charged with offenses involving the trafficking of fentanyl and heroin for which the maximum term of imprisonment is life, they are presumed to pose a danger to the community and a risk of flight. Accordingly, the defendants bear the initial burden of showing that they are not a danger to the community or a flight risk. For the reasons set forth below, the defendants cannot sustain that burden.

### B. The Defendants are a Danger to the Community

### 1. The Nature and Circumstances of the Offenses Charged

As detailed above, the defendants are members or associates of a state prison gang responsible for the introduction and trafficking of very dangerous substances such as fentanyl and heroin.  Some of these defendants are charged with drug trafficking

that led to at least four fentanyl overdoses and deaths inside Ponce Maxima, which is a maximum state prison facility. Drug trafficking involving the introduction of drugs into the facilities that are supposed to work in the rehabilitation of prisoners is a direct taunt to the officials responsible for protecting the staff and other inmates that work and are housed in these facilities.

Prisons are dangerous, and the complete disregard shown by the defendants charged in the case, to include finding several methods to fool those that are supposed to prevent the introduction of narcotics into correctional facilities indicate that there are no conditions that can be imposed to prevent the danger these defendants represent to the orderly function of prison facilities and the rest of society. And for these crimes, some defendants face at least a 10-year mandatory minimum and others twenty-year, and up to life imprisonment. Such a sentence creates a powerful incentive for defendants to flee should they be released on bond, confirming that defendants are a serious risk of flight. When the incentive to flee is so strong, no combinations of sureties and other restrictions can assure the defendants' appearances. *See, e.g.*, *United States v. English*, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); *Jackson*, 823 F.2d at 7; Martir, 782, 8 F.2d at 1147; *United States v. Henderson*, 57 F. App'x 470, 471 (2d Cir. 2003) (summary order)

Moreover, and as described in the Indictment, defendants and the Gang members furthered their narcotrafficking operations through corruption/staff indifference and the use of unauthorized privileges that allow their drug trafficking activities to flourish. This behavior depicts individuals who have the experience and ability to thwart government and law enforcement efforts to disrupt criminal activity—individuals who have no respect for the public authority and the rule of law. Thus, there is no reason to believe that the defendants would obey the Court's orders or conditions of release if bail was granted, and the nature and circumstances of the charged offenses justify detaining the defendants.

2. <u>The Weight of the Evidence</u>

The evidence of defendants' guilt is overwhelming.  They involve information and evidence gathered through Sources of Information and Cooperators.  Moreover, the drug trafficking activities of the defendants is corroborated by several recorded conversations of the Gang members as they plan and execute drug ventures, all intercepted through wiretaps.

3. <u>The History and Characteristics of the Defendant</u>

   a. <u>Defendants' prior criminal histories</u>

Most of the defendants for which the United States is seeking detention have a prior history of arrest and/or felony convictions.  These will be discussed individually at the detention hearings in the cases in which the United States will be seeking detention.

4. <u>The Nature and Seriousness of the Danger Posed by Release</u>

The facts and circumstances of this case compel the defendants' detention, as the factors set forth in the Bail Reform Act show that their criminal activities and narcotics trafficking pose a danger to the community. The Gang and its members engaged in a widespread conspiracy for the introduction of dangerous drugs into an already dangerous environment for correctional officers and inmates alike. The drug trafficking operation involved the use of new methods such as the use of aerial drones, and other alternate ways of bringing drugs such as the use of food items, television sets, remote controls, fans, PlayStations and other items. This was all done with the use of an elaborate corrupt system of fooling and evading correctional authorities and taking advantage of lax enforcement of rules and regulations inside the prisons, for the significant benefit of the Gang and its members. The drug trafficking provided the Gang with significant power inside and outside of the prison facilities, which in turn led to a cycle of the use of violence by the Gang inside the prison to be able to continue to operate successfully.

Further, the defendants have already demonstrated their willingness to undermining the rule of law by the use of deception and other corrupt tactics to gain an advantage over the correctional officers in these facilities. Taken together, these facts demonstrate that releasing the defendants under these circumstances would pose a significant danger to numerous individuals inside the prison system and the community at large. No condition or combination of conditions can assure their safety.

As to any additional information that the United States may present at any detention hearings, the United States submits to the Court that it will await the production of the United States Probation Office's Pretrial Services Report and will address any bail request individually at any bail hearing scheduled by the Court.

The United States reserves its right to supplement any of the information hereby provided in this memorandum for purposes of any detention hearings.

<u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully submits that the defendants cannot rebut the United States' proof that supports the presumption that "that no condition or combination of conditions will reasonably assure [his] appearance . . . as required and the safety of the community." 18 U.S.C. § 3142(e). Accordingly, the defendants should be detained pending trial.

WHEREFORE, the United States respectfully requests that the defendants for which the United States seek detention be detained pending further proceedings in the case.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 17th December of 2024.

W. STEPHEN MULDROW
United States Attorney

s/ Jorge L. Matos
Jorge L. Matos – G01307
Assistant United States Attorney
Torre Chardon, Suite 1201
350 Carlos Chardon Street
San Juan, PR 00918
Jorge.L.Matos2@usdoj.gov
787-766-5656

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties.